**INDIAN RIVER RECOVERY CO., Plaintiff,**

v.

**THE CHINA, her appurtenances, furniture, cargo, etc., Defendant,**

v.

**OCEAN WATCH, Intervenor.**

**Civ. A. No. 85–315 CMW.**

United States District Court, D. Delaware.

Sept. 30, 1986.

Bayard J. Snyder, of Phillips & Snyder, Wilmington, Del., for plaintiff.

Patrick Scanlon, of Barros, McNamara & Scanlon, Dover, Del., for intervenor.

William C. Smith, Sp. Counsel, The Atlantic Alliance for Maritime Heritage Conservation, Washington, D.C., amicus curiae.

CALEB M. WRIGHT, Senior District Judge.

This is a maritime action, in which plaintiff Indian River Recovery Company, Inc. ("IRRC") and intervenor Ocean Watch, a not-for-profit corporation formed by sport scuba divers, charter-boat operators and fishing boat captains, seek the right, exclusive of each other, to dive upon and to salvage the remains of a nineteenth-century shipwreck.

The wreck, popularly called the China Wreck because of its cargo of English ironstone dishes, is located on the floor of the Delaware Bay between Lewes, Delaware and Cape May, New Jersey, in the federally administered "contiguous zone," outside the territorial limits of both Delaware and New Jersey.

The procedural posture of the case is set forth in the Court's earlier opinion permitting Ocean Watch to intervene. 108 F.R.D. 383 (D.Del.1986). IRRC seeks exclusive salvage rights to the China Wreck. Ocean Watch has moved for a permanent injunction to prohibit IRRC from salvaging the wreck commercially. Ocean Watch does not seek commercial salvage rights to the vessel.

After a one-day hearing that elicited facts necessary to decide the remaining

issues, and for the reasons set forth below, the Court will grant Ocean Watch's motion to enjoin IRRC from commercially salvaging the China Wreck. The Court also will dismiss IRRC's salvage action against the China Wreck.

## I. FACTS

The Court's earlier opinion sets forth the facts surrounding the discovery of the China Wreck by the National Oceanographic and Atmospheric Administration ("NOAA") in 1970. Word of the discovery quickly spread throughout the scuba diving community. Sport divers immediately began diving upon the wreck and bringing to the surface the accessible ironstone dishes, cups and saucers that comprised the ship's cargo.

Thousands of divers, including Robert W. Tattersal, president of Ocean Watch, and Eugene B. Hastings, Sr., who has built his business on diving the China Wreck, have made the shallow forty-foot dive during the last fifteen years and have brought to the surface over ten thousand pieces of its ironstone china cargo. The wreck provides the relatively rare opportunity for inexperienced divers to recover souvenirs of their dives—pieces of ironstone china that recently have washed from beneath the mostly-buried hull of the wreck. Expert testimony revealed the ironstone china aboard the wreck to have little, if any, intrinsic or market value.

No individual sport diver ever surrendered any artifacts from the wreck to the custody of the District Court or requested a salvage award from the Court.

On May 29, 1985, IRRC filed a complaint against the China Wreck requesting exclusive rights to dive upon and salvage it under the maritime theories of salvage and finds. Upon discovery of a warrant of arrest affixed to the wreck, the sport scuba diving community joined with fishing boat captains to form Ocean Watch for the purpose of preventing IRRC from obtaining exclusive rights to dive upon the wreck and from possibly destroying the wreck by its salvage attempts. The sport diving members of Ocean Watch assigned all their salvage rights to the organization. Ocean Watch successfully moved to intervene in the action, and has alleged competing claims of salvage and finds.

## II. JURISDICTION

This case is properly before the Court under federal admiralty and maritime subject-matter jurisdiction. 28 U.S.C. § 1333 (1982). IRRC filed its complaint alleging both *in rem* jurisdiction over the vessel and *in personam* jurisdiction over any parties, such as Ocean Watch, that claimed an interest in it.

The vessel lies almost 11 miles east of Lewes, Delaware, outside the territorial limits of the State of Delaware, whose territory is identical to that of the United States District Court for the District of Delaware. Fed.R.Civ.P.Supp. Admiralty Rule E(3)(a) requires that "process *in rem* and of maritime attachment and garnishment shall be served only within the district." The only process served in this matter is upon the vessel, outside the District of Delaware. No party has served process upon any artifact from the vessel that was brought into the District of Delaware.

The complaint properly alleges *in personam* jurisdiction over parties claiming an interest in the vessel, and Ocean Watch is the only other party to claim an interest. Service of the warrant of arrest outside the territorial limits of the District of Delaware is insufficient for the commencement of a salvage action against the wreck or its contents. The Court thus lacks *in rem* jurisdiction over the vessel and its artifacts. *See Platoro, Ltd. v. The Unidentified Remains of a Vessel*, 508 F.2d 1113 (5th Cir.1975) (*in rem* jurisdiction must be established at time action filed for exception to Admiralty Rule E(3)(a) to attach later); *cf. Treasure Salvors, Inc. v. The Unidentified, Wrecked and Abandoned Sailing Vessel "Nuestra Senora de Atocha."*, 546 F.Supp. 919 (S.D.Fla.1982) (*in personam* jurisdiction over competing

salvors combined with vast array of artifacts properly arrested within district amounted to a "qualified jurisdiction *in rem* which was likely to ripen into full *in rem* jurisdiction.").[1] (on remand).

## III. DISCUSSION

■ The common law of finds governs this action. The law of finds is based upon the concept of *animus revertendi* —the owner has no intention of returning.[2] A demonstration of possession and control of abandoned property is a prerequisite to an award of title under the law of finds. *Hener v. United States*, 525 F.Supp. 350, 356 (S.D.N.Y.1981).

■ The law, however, does not require one who discovers abandoned property actually to have it in hand. The law protects the rights of persons who discover abandoned property, and who are actually engaged in "reducing it to possession", to complete this project without interference. "In order to acquire a legally cognizable interest in lost or abandoned property, a finder need not always have 'manual' possession of the thing," holds the Fifth Circuit. "Rather, a finder may be protected by taking such constructive possession of the property as its 'nature and situation permit.'" *Treasure Salvors v. Unidentified Wrecked, and Abandoned Sailing Vessel*, 640 F.2d 560, 572 (5th Cir.1981) (citation omitted).

Since discovery of the wreck, sport diving members of Ocean Watch regularly have engaged in the salvage of the ship's cargo. Ocean Watch's charter-boat-captain members rely upon the wreck's availability as a diving destination for a substantial portion of their business. Ocean Watch, moreover, has shown its ability to salvage the vessel's cargo by hand removing china pieces continually exposed to the actions of currents and tides. This method not only guarantees the integrity of the vessel's structure as an artificial reef for abundant marine life, but assures at least fifteen, and perhaps fifty, more years that the wreck can be used for recreational and commercial fishing and diving.

■ IRRC's short-term commercial salvage operation is not intrinsically superior. One of the fundamental policies underlying the maritime law of salvage, under which IRRC asserts its claim to the wreck, is to return the salvaged items to the stream of commerce. Testimony in this case reveals that the founders of Ocean Watch recovered over ten thousand artifacts from the ship which they several times attempted to market without success. The dive boat and fishing boat captain members of Ocean Watch instead have succeeded in making the salvage operation itself a viable commercial enterprise. Sport divers who pay to visit the wreck come home with artifacts they have salvaged themselves; while fishermen pay charter boat captains to take them to a productive fishing site.

■ Members of Ocean Watch began to use and possess the China Wreck fifteen years before IRRC's late arrival. Ocean Watch has proven its ability to salvage the wreck in a manner that provides substantial recreational enjoyment and commercial success. It has every intention of continu-

---

**1.** The situation here differs from that in *Treasure Salvors* in which the United States District Court for the Southern District of Florida recognized a quasi-in-rem jurisdiction over the wreck of The Atocha. There, the contents of the ship, recovered from outside the district, were brought within the district, where several artifacts from the ship earlier had been arrested. Each artifact brought ashore was placed in the custody of the Court. 546 F.Supp. at 928–929. The Court reasoned that eventually the entire contents of the vessel soon would be placed in its custody within the district, and so retained a quasi-in-rem jurisdiction over the contents of

the vessel that would ripen into in rem jurisdiction as the salvors brought the last items ashore.

Here, no items recovered from the China Wreck have been arrested within the District of Delaware. Fed.R.Civ.P.Supp. Admiralty Rule E(3)(a) limits the Court's *in rem* jurisdiction.

**2.** The law of finds generally results in an award of title to a sunken vessel and her cargo. *Hener v. U.S.*, 525 F.Supp. 350, 356–57 (S.D.N.Y.1981). In this case, however, the Court lacks *in rem* jurisdiction over the wreck, so the only rights awarded to the China Wreck are those of Ocean Watch vis-a-vis IRRC.

ing to use and possess the wreck as it has in the past, and to salvage it in a way that benefits the sport-diving and fishing communities. Ocean Watch has established its superior rights to dive the China Wreck under the law of finds, and is entitled to an order permanently enjoining IRRC from commercially salvaging the wreck.

■ The overwhelming majority view holds that district courts, in an admiralty action, have authority to issue a permanent injunction, pursuant to Fed.R.Civ.P. 65. The Fifth Circuit's conclusion is the one most often quoted:

> The Chancellor is no longer fixed to the woolsack. He may stride the quarterdeck of maritime jurisprudence and, in the role of admirality judge, dispense, as would his landlocked brother, that which equity and good conscience impels.

*Compania Anonima Venezolana De Navegacion v. A.J. Perez Export Co.*, 303 F.2d 692, 699 (5th Cir.), *cert. denied*, 371 U.S. 942, 83 S.Ct. 321, 9 L.Ed.2d 276 (1962). The unification of law and admiralty rules in 1966 vested district courts with the power to grant equitable relief in admiralty cases, particularly injunctions. *McKie Lighter Company v. City of Boston*, 335 F.Supp. 663, 666–667 (D.Mass.1971) ("Whatever may have been the situation before the 1966 unification of admiralty with other civil actions, today a United States District Court in an admiralty controversy has power to issue an injunction restraining a maritime tort."). *Cf., Eddie S.S. Co. Ltd. v. P.T. Karana Line*, 739 F.2d 37, 38–39 (2d Cir.1984) (declining, *in dicta*, to adopt or reject the reasoning of the First and Fifth Circuits that admiralty courts can issue injunctions.).

Although this modern rule contradicts the historical segregation of admiralty and equity, the Circuit Courts believe the Supreme Court, which has remained silent on the question, would not today adopt the old rule. The First Circuit, in the most thorough review to date of the power of courts to issue permanent injunctions in admiralty, concluded:

We find no constitutional, statutory or policy reasons of substance for recognizing a continued limitation upon the power of federal courts sitting in admiralty, nor does it seem likely that the Supreme Court would today adhere to the traditional rule.

*Pino v. Protection Marine Ins. Co.*, 599 F.2d 10, 14–15 (1st Cir.1979), *citing Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.*, 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed. 1206 (1950) and *Vaughan v. Atkinson*, 369 U.S. 527, 530, 82 S.Ct. 997, 999, 8 L.Ed.2d 88 (1962). *See also Lewis v. S.S. Baune*, 534 F.2d 1115, 1121 (5th Cir. 1976); Rule 1, Fed.R.Civ.P.; 14 Wright & Miller, *Fed. Practice & Procedure* § 3671 at 273 (1976); Colby, *Admiralty Unification*, 54 Geo.L.J. 1258, 1268 (1966); *Stern, Hays & Lang, Inc. v. M/V Nili*, 407 F.2d 549, 551 (5th Cir.1969); *American River Lines, Inc. v. Central Soya Co.*, 524 F.Supp. 246, 248 (1981); *Complaint of Valley Towing Service*, 629 F.Supp. 139, 147 (E.D.Mo.1985).

In deciding whether or not to grant permanent injunctive relief, a court should consider (1) whether plaintiff has prevailed on the merits; (2) whether the balance of equities favors the moving party; and (3) what form the injunctive relief should take. *Philadelphia Welfare Rights Organization v. O'Bannon*, 525 F.Supp. 1055, 1057 (E.D.Pa.1981); *Philadelphia Citizens in Action v. Schweiker*, 527 F.Supp. 182, 193, *rev'd. on other grounds*, 669 F.2d 877 (3d Cir.1982).

Allowing IRRC to salvage the wreck would permanently damage intervenor Ocean Watch, and would contravene the public interest. The equities and the merits counsel in favor of a permanent injunction enjoining IRRC from commercially salvaging the China Wreck.

This Opinion constitutes the Court's Findings of Fact and Conclusions of Law in accordance with Federal Rules of Civil Procedure 52(a).

An Order will enter in conformity with this Opinion.